Beall, executor, *vs.* Blake *et al.*

No. 18.—NATHAN H. BEALL, executor, plaintiff in error, *vs.* SAMUEL R. BLAKE, *et al.* defendants.

[1.] There is a bill and a demurrer to it.  The Court is about to decide the demurrer.  Before it does so, however, the plaintiffs strike out a part of the bill.  By leave, they afterwards re-insert what they had struck out.  The defendants, after this, both plead, answer and demur to the bill, and after doing so, and on the trial before the Jury, and in the midst of the argument to the Jury, they move to have the amendment of the bill, containing the re-inserted matter, taken off the files : *Held,* that the motion was properly over-ruled.

[2.] Whether a specific legacy, if not illegal, has been adeemed or not, *depends* on whether the testator's *intention* has been to adeem it.

[3.] In a bill against an executor, it is not, in general, neeessary that the legatees should be parties.

[4.] One whose interest in a bill does not appear, is not a proper party to the bill.

In Equity, in Houston Superior Court.   Decided by Judge HARDEMAN, April Term, 1854.

The facts of this case, are as follows :

In 1834, Mrs. Rebecca Bostwick died testate, leaving a large estate.  Her will contained sundry specific legacies, and the remainder was bequeathed to certain residuary legatees, of whom Mary Adeline Beall, who afterwards married Blake, the defendant in error, was one.  Nathan H. Beall was her executor.  After her death, a litigation arose between her legatees, and the legatees under the will of her former husband, Jacob Bostwick, in which the question was, how much of the estate she had the right to dispose of by will.

The result was a decree, that the estate (the whole of which Mrs. Bostwick had bequeathed,) should be equally divided; and that one half of it should be paid out, under her will, and the other half under the will of Jacob Bostwick.

The present case is a bill filed by Samuel R. Blake, in right of his former wife, (she being since deceased,) and by Nathan Allen, a trustee under her will, against Nathan H. Beall, ex-

ecutor, for the residuary legacy of Mary Adeline Blake.   The object of the bill, among other things, was to have the specific legatees under Mrs. Bostwick's will, to abate one half, in consequence of the decree before mentioned, so that the loss should fall, rateably, on them and on the residuary legatees.   To this bill the defendant filed a demurrer, for want of equity, and for want of proper parties, none of the specific legatees being made parties, and for misjoinder of parties, in making Nathan Allen a party plaintiff.   He also filed a plea, setting forth, that in the bill originally filed in this case, the same matter, in relation to the abatement of the specific legatees, had been set up ; and that a demurrer was filed thereto, and that the Chancellor was about to give judgment for the defendant on demurrer, when the complainants struck out the matter in question from their bill ; that defendant believing that the point had been abandoned by complainants, had gone on, in good faith, to pay out certain of the specific legacies ; and that the matter had been again brought in, by way of amendment to the bill.

During the progress of the argument on the demurrer, a motion was made by defendant, to take this amendment from the files, " it having been improperly filed, and without proper leave of the Court" as the defendant insisted .   As to this amendment, there had been made an order of the Court below, as follows :

"Samuel R. Blake *et al.*  
    *vs.*                      } *Bill, &c. in Houston.*  
Nathan A. Beall, executor.

On motion of complainant's Solicitor, ordered, that the order setting down the above stated case be opened, and that complainants have leave to amend their bill, in the case stated, and that they serve defendant with a copy of said amendment, in terms of the law".

Service of the amendment made on this leave—the amendment aforesaid, moved to be taken from the files—was acknowl-

edged by Whittle, Solicitor for defendant, on the 26th of October, 1853.

Which motion the Court refused, as coming too late. The Court likewise over-ruled the demurrer, and the plea, ordering the plea to stand for an answer; to which several decisions, the defendant excepted.

NISBET; WHITTLE, for plaintiff in error.

RUTHERFORD, for defendant.

*By the Court.*—BENNING, J. delivering the opinion.

[1.] Should the Court below, on the motion of the defendant in the bill, have ordered the amendment to be taken from the files?

The only reason assigned by the defendant for this motion was, that the amendment had, as he insisted, been "irregularly and improperly put in, the subject-matter having been before passed on."

But it is not true, in point of fact, that the "subject-matter" of the amendment had been "passed on." What is true is this: When the Court was about to give judgment—about to "pass on" that "subject-matter", the subject-matter was, by the complainants, struck from their bill, and so the Court was *prevented* from giving such judgment.

Afterwards, the Court gave the complainants leave to amend their bill, and then they re-inserted this same matter in the bill.

The bill, thus amended, the parties went to trial, and whilst the argument was going on before the Jury, the defendant made this motion, to have the amendment taken off the files.

This motion, the Court over-ruled, as coming too late—coming after the filing of his "plea and demurrer"—the plea and demurrer to the bill as it stood, with this matter re-inserted in it.

That reason may, perhaps, have been sufficient, but if that was not sufficient, the other which existed was so, viz: its not

having been true, as matter of fact, that the Court had ever "passed on" the "subject-matter" of the amendment was sufficient, taken in connection with the large power of the Court, as a Court of Equity, to allow amendments. *Brown and others vs. Redwyne and others*, (14 *Ga. R. Decatur*, 1854.)

That the Court allowed the complainants to strike from their bill the matters which they afterwards, by amendment, again put into it, instead of being evidence of the Court's having passed judgment on those matters, is evidence of its not having done so ; is evidence of leave, given by the Court to the complainants, to withdraw those matters from the danger of adjudication, and save them for use, if their use should be desired on another occasion—is evidence of any thing rather than of a "retraxit."

In point of fact, then, there having been, as to the amendment, neither a judgment of the Court, nor a retraxit of the party, and the time of the allowance of the amendment having been not too late, what existed to require the Court to order the amendment to be taken from the files ? Nothing, as far as we can see.

One of the grounds of demurrer to the bill, is stated in these words : "Because, by complainants' own showing, said Blake, in right of his said wife, is only a residuary legatee under said will, while the legacy and negroes, bequeathed to said Mrs. Powers, was specific ; and it is illegal and inequitable that a specific legacy should abate in favor of a residuary legatee." Was this a good ground of demurrer ?

A testator's intention, if that is not illegal, is the law to his will. To this rule there is no exception, of which I am aware. And yet I am aware, that in 1786, Lord Thurlow, as Chancellor, in the case of *Ashburner vs. McGuire*, commenced the making of an exception to it, and that in the course of a short time afterwards, in the cases of *Badrick vs. Stevens* (3 *Brown C. R.*) *Stanley vs. Potter* (2 *Cox*) and *Humphries vs. Humphries*, (2 *Cox*) he completed the work, as far as in him it lay to complete it.

In the last of these cases, he makes the announcement, "that

he was satisfied, from the consideration he had given to the cases on a former occasion, that the only rule to be adhered to, was to ascertain whether the subject of the specific bequest remained *in specie*, at the death of the testator; and if it did not, that then there must be an end of the bequest; that the idea of discussing *what might be the particular motives and intentions* of the testator, in each case, in destroying the subject of the bequest, would be productive of endless uncertainty and confusion." (*Roper on Leg.* 244.)

Now a thing cannot be said to "remain *in specie*", a testator's, at the time of his death, if before that time he has sold it or otherwise parted with it, or if the thing has perished, or if it was never his, but was always another's, although he thought it to be his when he bequeathed it.   Lord *Thurlow's* announcement comes, therefore, to this : that if a testator, after making his will, has sold the thing which constitutes a specific bequest, or has otherwise parted with it ; or if the thing has, itself, perished ; or if it was never his to bequeath, but was always another's, although he thought it his—in any of these cases, the specific bequest is adeemed—is so completely adeemed, that if the case be that the thing given has perished, there can be no replacement of it by an equivalent, in money or other thing ; or if the case be, that the thing bequeathed has ceased to belong, or has never belonged to the testator, there can be made, by the executor with the true owner, no arrangement by which to render the thing subject to the bequest, no odds how manifest it may be, in the will, that the testator intended such replacement, or arrangement, whichever it might be, that the case should require.

This exception, thus declared by Lord *Thurlow*, to the old rule—the rule which makes the intention of the testator, if not illegal, the law to a will, was, in England, followed, in a number of cases, and in perhaps a still greater number, was not followed.   Cases in which it has not been followed, or in which, in the opinion of *Roper*, it would not be followed, because too directly in the teeth of decided cases, are of the following kinds.:

Cases in which "the alteration of the fund is made by *mere act or operation of law*".

Cases in which "a breach of trust has been committed, or any trick or device practised, with a view to defeat the specific legacy".

Cases in which "the fund, instead of being annihilated, remains the *same*, or *in substance* the same, as at the date of the will"—as "if stock, specifically given, be merely transferred, with the testator's consent, from the name of the trustee into his own".

Cases in which "the testator lends the stock specifically bequeathed, on condition of its being replaced". (1 *Rop. Leg.* 240–1.)

Cases like that "in which A bequeathed the sum of 550*l.* then in B's hands," and in which "it appeared that before the will was made, A had placed that sum with B, and obtained his note for it", and in which "it appeared that A had also, *before* the making of his will, drawn several bills upon B, which reduced the 550*l.* to 430*l.*" (1 *Rop. Leg.* 445.)

Cases in which "an arrear of interest, due upon a debt at the date of the will, is specifically bequeathed, and the testator afterwards receives interest upon the principal sum", which he appropriates, "in discharge of interest accrued *after* the making of his will."

Cases like that of *Thomond vs. Suffolk,* in which "A being possessed of two bonds, the one for 2000*l.* from B, her grandson, and the other for 2000*l.* from C, her grand-daughter, bequeathed both securities to C, and declared, that if all or any part of the two sums should be *paid in* before her death, C should have 4000*l.* or so much money as the principal, *so paid in,* amounted to"; and in which "A *released* to B his bond debt, without receiving any of the money". (1 *R. Leg.* 245–6.)

Cases like that of *Pulsford vs. Hunter,* "in which A, after giving two small annuities, bequeathed as follows : 'this is an account of *value, now* in my possession, and out of which the said yearly sums are to be paid—bank notes to the amount of 190*l.* ; cash, 10*l.* 10*s.* ; ditto, in the hands of Mr. Drummond,

2476l. 5s.; 2676l. 15s. the interest of the remaining part, to be applied for the use and education of my grand children, till they arrive at the age of 21, and the principal to be then equally divided between them,' " &c. and in which "it appeared that A had no cash in possession, at his death, but that he was possessed of two bank notes, amounting to 30l.; also, that Hunter, in January, 1779, and at A's request, left with Messrs. Drummond two navy bills, the property of A, to the amount of 2462l. 5s. 4d. and that in August, 1790, Government discharged the navy bills and interest, with seventeen exchequer bills, of 100l. each, and with 921l. 1s. cash, making a total of 2621l. 1s.—which exchequer bills remained in the hands of Messrs. Drummond, in the name of Hunter, and the 921l. 1s. placed to his account; that in September, 1780, Hunter drew a draft on Drummond, for 21l. 1s. in favor of testator, which was paid; and he afterwards took out the remainder of the sum, and bought nine other exchequer bills, of 100l. each, and left them with Drummond, in his own name, which made up twenty-six exchequer bills; that afterwards, sixteen of the exchequer bills were deposited with Drummond, at the testator's request, in his own name, and the remaining ten bills were paid to Hunter and another person, in satisfaction of a debt of 1000l.; and it appeared that the testator never had any property in the hands of Drummond, in his own name, except as before stated". And this case was determined by Lord *Thurlow*, himself. (1 *Rop.* 246–7.)

Cases in which a testator specifically bequeaths such goods as, at the time of making his will, he has in a particular house, but which goods, at his death, are not found remaining in that house—having been removed thence to save them from fire.

Or having been removed thence by fraud, or without the testator's knowledge.

Cases in which the goods specifically bequeathed, are, at the time of the making of the will, on board of a particular ship; but, at the time of the testator's death, are not found remaining in that ship—having been taken out of it.

Cases in which a person, having two houses, A and B, in

which he alternately resides, and having but one set of furniture, which he carries with him to each house, as he removes from one to the other, bequeaths, while living at A, all his furniture at A, and dies while living at B, having all the furniture then with him, at B. It was again Lord *Thurlow*, himself, who decided a case of this sort. (1 *Rop. Leg.* 246-7.)

Cases in which the testator, after making his will, pawns or pledges the thing specifically bequeathed, and dies without having redeemed it, or otherwise recovered possession of it.

Cases in which a partner specifically bequeathes "his share of the profits, (naming the *amount*,) and upon the expiration of the old" articles of copartnership enters into a new—such new articles as alter his share of the profits.

In cases of these kinds, it appears that Lord *Thurlow's* exception, is not to govern ; and yet, they are kinds which fall within the very letter of it ; for they are kinds of cases, in none of which is the specific thing bequeathed found " *remaining*", at the testator's death.

On the other hand, in numerous cases, not in any *material* respect, as far as I can see, distinguishable from these, the exception has been followed. A reference to these may be found in *Roper on Leg.* 1, 238, and subsequent pages, and in the note to *Ashburner vs. Macguire*, in 1 *White & Tudor's Equity Cases.*

The upshot of this innovation of Lord *Thurlow*, was a state of evil so intolerable, that Parliament had, at length, to interpose with a Statute for its suppression. This Parliament did, by Statute 1 *Vic. c.* 26, §23, which enacts, " that no conveyance, or other act, made or done subsequently to the execution of a will of, or relating to any real or personal estate therein comprised, except an act by which such will shall be revoked, as aforesaid, shall prevent the operation of the will, with respect to such estate, or interest in such real or personal estate, as the testator shall have power to dispose of by will, at the time of his death". And section 24, which enacts "that every will shall be construed with reference to the real estate, and personal estate comprised in it, to speak and take effect as if it

had been executed immediately before the death of the testator, unless a contrary intention shall appear in the will".

The effect of these enactments must be, in a great measure, if not altogether, to suppress Lord *Thurlow's* innovation, and to make the old rule of its pristine breadth—to make it a rule without exception—the old rule, that the testator's intention gives law to his will.

That this rule was the rule in force, in England, before the time of Lord *Thurlow's* innovation, 1786, and at the time when the law of England was adopted by this State; and as much in force, in reference to the question of ademption, as to any other question that can arise on a will, is apparent from many decisions, and from whatever of authority there is in *Swinburne and Fonblanque.* (*Swin. on Wills,* 7 *pt. ch.* 20, and *Fonblanque's Equity, bk. IV. ch. II.* §1.)

In *Partridge vs. Partridge,* Lord *Talbot* said, "all cases of ademption—of ademption of legacies, arise from a supposed alteration of the intention of the testator; and if the selling of the stock is an evidence to presume an alteration of such intention, surely his buying in again, is as strong an evidence of his intention that the legatee should have it again". (1 *White & Tudor's Eq. Ca.* 390.) To the same effect, more or less, are the following cases: *Orme vs. Smith,* 2 *Ver.* 681. *Crockat vs. Crockat,* 2 *P. Wms.* 165. *Rider vs. Wager,* 2 *do.* 330. *Ford vs. Fleming,* 2 *do. Earl of Thomond vs. Earl of Suffolk,* 1 *do.* 464. *Avelyn vs. Ward,* 1 *Ves. Sr.* 420. *Drinkwater vs. Falconer,* 2 *do.* 624. *Ashton vs. Ashton,* 3 *P. Wms.* 385. *Hambling vs. Lister Ambler,* 401. *Backwell vs. Child,* do. 260. *Bronson vs. Winter, do.* 57. *Lawson vs. Stitch,* 1 *Atk.* 508. *Wingfield vs. Newton,* 9 *Mod.* 428.

This rule, then, being the one which was in force in England, at the time when Georgia adopted English Law, is, it may be assumed, the rule which Georgia adopted. And if her Courts had the power to leave it and to follow Lord *Thurlow,* ought they to do so, seeing the consequences which resulted from his being followed by the English Courts, a state of evil so great as to call for the redressing hand of the Legislature; and yet such

a state of evil as, in the opinion of the Legislature, might be redressed, simply by a return to the old rule—ought they not rather to stick to this old rule? But they have no discretion. They must stick to it, for it is, to them, the law.

This being so, the question therefore is, what was the intention of Mrs. Bostwick, in making her will—her intention in reference to the ademption or non-ademption of the legacy to Miss Beall, (who has become Mrs. Powers,) in case the property bequeathed to her should turn out to be owned, in whole or in part, not by her, the testatrix, but by others? To answer this question, it is necessssary to look to the will itself.

The will is in the following words:

" GEORGIA CLARK COUNTY :

In the name of God, amen. I, Rebecca Bostwick, being of sound and disposing mind and memory, do make and ordain this my last will and testament, hereby revoking all former ones.

First. It is my will and desire that all my just debts be paid.

Second. I give to Eliza Bostwick, daughter of John and Betsey Bostwick, of Louisville, One Thousand Dollars, subject, nevertheless, to this restriction : the said legacy shall remain in the hands of my executors, for the full space of four years from the date of their letters testamentary, for the purpose of defraying thereout the expenses of any law-suit, which may be commenced within that time, by the relations of my late husband, for the recovery of any of the property left by him to me. And if such suit should terminate in favor of my estate, then the above legacy, after deducting said expense, to be paid to Eliza—if unfavorable, then the said legacy to be null and void.

Third. I give to my niece, Frances Lumpkin Beall, now with me, the following negroes, to-wit: Owen, Moses, Abram, Anna and her four children, Sam, Lewis, Mary and her youngest one, whose name is not at present recollected, together with their future increase; also, Fifteen Hundred Dollars, for the purpose of educating her; and a mahogany bedstead, bed,

Beall, executor, *vs.* Blake *et al.*

mattress and furniture for the same, with my bureau and washstand.

Fourth.   I give to my niece, Valinda Burton, a bed, mattress and furniture for the same.

Fifth.   I direct that my farm, near Athens, be sold, together with the farming utensils thereon, and the money arising therefrom, beequally divided between my sister Eleanor, and Tabitha J. Groves.

Sixth.   The remainder of my estate, both real and personal, including money, debts, dues and demands, it is my will and desire, should be divided into four equal shares, and distributed in the following manner :   To my sister, Mary Hodges, and son Robert, one share ;  to my sister, Eleanor Harris, and son Thomas, one share ;  to my sister, Tabitha J. Groves, and daughter, Valinda R. Burton, one other share ;  to my brother, Nathan H. Beal, and my niece, Mary Adeline Beall, the remaining last share, on the following conditions, to-wit : that in the event of the death of any one or more of said legatees, without any heir of their body, the portion of the one so dying, then to go to the survivor who shared with the one so dying ;  and at the death of such survivor, if no heir of their body be living, for said property, together with their former share, to return and be considered a part of my estate, and divided equally between my surviving sisters and brother, except that share given to my brother, Nathan H. Beall, and niece, Mary Adeline : the only condition on which any of that property is to return, is at the death of Mary Adeline, without an heir of her body, that her portion be subject to an equal division between my sisters and brother, and their children.

Seventh.   I do hereby constitute and appoint James Beall, James A. Groves and Nathan H. Beall, executors to this my last will and testament.    And lastly—the law will not allow me to manumit my two faithful servants, Step and his wife Sibby, but I now call on you, my relations, and especially those whom I have remembered in this my last will, to remember me, and regard this as my dying request, to see that they are, from

xvi–17

and after the 25th day of December next, no more to be held in slavery, but to give them their liberty, and to protect them in its enjoyment, and to make up to them the sum of Four Hundred and Fifty Dollars, for the purpose of better enabling them to settle themselves."

It appears, that at the time when Mrs. Bostwick made this will, there was in existence a will of her late husband, Jacob Bostwick, which, among other bequests, contained this: " I give and bequeath unto my dearly beloved wife, Rebecca Bostwick, after all my just debts are paid, the whole of my estate, both real and personal, to reap the profits thereof, during her widowhood: but.in the event of her marriage, then, and in that case, she is to have only one-half of the aforesaid estate, to be at her own disposal, and the other half to be divided between my sister, Betsey Bostwick, my brother Littleberry Bostwick, and my brother Nathaniel Bostwick's son, James Beall Bostwick," &c. in certain named proportions.

Now, this bequest, in this will, is very plainly what Mrs. Bostwick has reference to, in the second item of her will, when she says that the bequest of the $1000 therein given to Eliza Bostwick, daughter of John and Betsey Bostwick, (Betsey being one of the said legatees in Jacob Bostwick, the husband's will) is given, subject to the restriction, that the legacy is to remain in the hands of her executors for four years, that out. of it the expenses of any law-suit, which might be commenced within that time, by the relations of her late husband, Jacob Bostwick, for the recovery of any of the property left by him to her ; and she has reference to the bequest, as what may be the foundation of a possible suit to be brought against her executors by her husband's "relations", for the recovery of some, or perhaps all of the property, left to her by that husband.

While making her will then, Mrs. Bostwick has in her mind the claim which her late husband's relations may set up against her executors, for the property, or some part of it, which she is disposing of by the will which she is engaged in making.

Having this possible claim in her mind, she makes one of the bequests in that, her will, depend upon how' the claim, if assert-

ed, might be decided, namely: that bequest of $1000 to Eliza Bostwick, who was the daughter of one of those "relations" of her husband, to whom she referred as possible parties to set up the claim, saying, that if the suit on that claim should result in favor of her estate, the bequest, after deducting from it the expenses of the suit, is to be paid to Eliza, the legatee: if not in favor of her estate, the bequest is to be null and void—that is to say, the bequest is to be considered as "adeemed."

Having this possible claim in her mind, she adeems, conditionally, one legacy—adeems it on condition that the claim, if asserted, shall go against her estate; and she adeems conditionally, or otherwise, no other legacy whatever—she makes no provision for any further change of any sort.

Is it not clear, then, that she *intended* no further change of any sort? Is it not clear that she intended the other legatees to have their legacies, whether her husband's relations should set up a claim or not, or whether the claim, if set up, should result for or against her estate? The expression of one thing is the exclusion of another.

This being so, it follows, that if the legacy to Miss Beall, who afterwards became Mrs. Powers, was adeemed at all, it was not adeemed by the testatrix, Mrs. Bostwick, but was adeemed by something acting contrary to her intention.

Was there any such something to adeem it? The defendants in error insist that there was. They insist that the testatrix owned no more than one-half interest in the negroes, which she bequeathed to Mrs. Powers; the other half having been owned, as they say, by her "husband's relations", the Bostwick's, and that she, therefore, was prevented, by this deficiency of her estate in the negroes, from conveying to Mrs. Powers any thing more than a half interest in them.

Was there any such something to adeem the legacy? The defendants in error insist, that as to one-half of the legacy, there was, namely, this: that she, the testatrix, did not own more than an undivided half of the negroes constituting the legacy. They say that the other undivided half, her "hus-

band's relations", the Bostwicks, owned. This they insist to be so, by reason of the following state of things :

After the death of the testatrix, Mrs. Bostwick, it appears that her "husband's relations", the Bostwick's, did set up the claim to her estate, which she apprehended they would, and that her executor, Nathan H. Beall, after they had done this, brought a bill of interpleader against them, and also against the persons claiming as legatees under her will, in which he prayed that the respective sets of claimants might interplead and adjust their rights among themselves, and that he might be directed, by decree, " to which of said claimants to pay the said property and effects, and each and every part thereof." And that upon this bill, the Jury found the following verdict : " We, the Special Jury, find and decree one-half of the estate of Jacob Bostwick, deceased, in favor of the legal representatives of Rebecca Bostwick, and the other half of said estate to be divided as follows, viz :" &c. (among the Bostwicks.) That by agreement of the legatees under Mrs. Bostwick's will, among themselves, this verdict was changed, by taking out of it the words " legal representatives of Rebecca Bostwick", and putting in their place the words, " legatees of Rebecca Bostwick".

This is the state of things from which it results, as the defendants in error insist, that at least one-half of the legacy to Mrs. Powers was adeemed—a state of things, which, as they contend, shows that even if Mrs. Bostwick's intention was to give the whole of each of the negroes of the legacy to Mrs. Powers, the intention was such as could have no effect, because, as they contend, the verdict says, that one-half of each of those negroes she did not own, and the law says that nobody shall will away property which he does not own.

Are the defendants right in this ?

What interest did Mrs. Bostwick, the testatrix, have in the property—the negroes of the bequest ? What power of bequeathing that property did such interest, whatever it was, give her ?

It appears that the whole property bequeathed by Mrs.

Bostwick, had been of " the estate of Jacob Bostwick", deceased, her late husband—that on his decease, it came from him to her.

The interest which she had in the property, the verdict finds to have been at least this much: that of a tenant in common or a joint tenant—a tenant in common or a joint tenant with the Bostwicks—for it finds one-half of the property "in favor" of those to whom she had given it by her will, and the other half "to be divided" among the Bostwick's, and no interest in her less than that of such a tenant would have been large enough to support such a gift of hers.

Assuming, then, that the testatrix, Mrs. Bostwick, was a tenant in common, or a joint-tenant with the Bostwicks in the property, had she the power to bequeath any specific part of the property, so as to convey the entire interest in such part?

It is, perhaps, true, that no tenant in common, or joint tenant, has power so to convey the common or joint property, as to divest the interest of his co-tenant, without the co-tenant's consent. With the co-tenant's consent, however, any such tenant has the power.

Did the testatrix, Mrs. Bostwick, have the consent of the Bostwicks, her co-tenants, to this specific bequest to Mrs. Powers?

Their conduct shows that she did. First, they accepted the verdict of the Jury, and that verdict said, in effect, that the will of her, Mrs. Bostwick, was to be carried into effect, as far as that was practicable, considering that she had but an undivided half interest in the property willed. The verdict, after being changed, by agreement, said that her "legatees" were to have their legacies, if those legacies could be got out of only half of the property—and the nature of those legacies was such that they could all be got out of one-half of the property, if, in the division of the property between the tenants in common, viz: the Bostwicks and her legatees, the part of the property constituting the specific bequests in the will, should be allowed to go into that half which should be allotted to the legatees. The legacies were general, except this to Mrs. Pow-

ers and a few others, of no great value. The whole amount of all the specific legacies, was not, by a great deal, equal to one-half of the whole property. One divided half, then, of the whole, if the half which contained in it the property that constituted the specific bequests, would be sufficient to satisfy those bequests, and also the general bequests; for these latter, by the will, were not to be of this particular amount or that, but were to be whatever the residue of the property, after the payment of the specific legacies, would admit of their being. The verdict said, in effect, to the Bostwicks—"in the division, let the property constituting the specific bequests, go into the share of the legatees, that, thus, the will may be satisfied".. And to this verdict, the Bostwicks consented. They made no objection to it. And therefore, they were bound by it. And to consent to the verdict, is the same as to consent to the will; which, indeed, it seems the verdict, in this particular, merely intended to adopt.

Secondly. But the Bostwicks, not only in this way, by consenting to the verdict, consented to the will—they did so in a more direct way—they actually agreed, with the executor, to such a division of the property, as threw the negroes composing this specific bequest to Mrs. Powers, into the share which he, as executor, was to retain; and thus, they actually agreed that he might administer those negroes, as if Mrs. Bostwick, the testatrix, had had the entire interest in them. And accordingly, the executor did, in fact, turn over those negroes to Mrs. Powers, or to her husband. This certainly, of itself, without any help from the verdict, or from the acceptance of the verdict by the Bostwicks, amounted to a consent, on the part of the Bostwicks, to the bequest of the negroes to Mrs. Powers, made by Mrs. Bostwick—amounted to a ratification, by them, of that bequest. This division with the executor, was the same, in legal effect, as would have been a similar division with Mrs. Bostwick, herself, made after the date of the bequest, had one, after that, been made with her. Suppose such a division to have been made with Mrs. Bostwick, herself, and afterwards, she had died without changing her will, leaving,

among the negroes which she had obtained as her share in the division, these negroes bequeathed to Mrs. Powers, would it be possible to doubt the validity of the bequest of them to Mrs. Powers—the validity of the bequest, of not merely a part, but of the whole undivided interest in the negroes?

The case, as it stands, in reality, is not substantially different from this supposed case.

The testatrix, Mrs. Bostwick, then, *did* have the consent of her co-tenants, the Bostwicks, to this specific bequest to Mrs. Powers.

This being so, and her *intention* having been seen to be not to adeem this specific bequest, whether the Bostwicks should sue her executor, and recover from him an undivided half, or any other portion of the property, willed or not, it follows that that bequest is not adeemed, in whole or in part, but remains, in its entirety, good, to Mrs. Powers.

But it was said, for the defendants in error, that this conclusion is in the teeth of *Webb vs. Webb*, 2 *Ver.* 110. There is, however, a wide difference between that case and this. First. It does not appear, in that case, that Webb, the testator, was, at the time when he was making his will, conscious of the existence of the custom of London, which would give his widow " one entire moiety" of his personal estate—that estate, part of which he was bequeathing in specific legacies—much less does it appear that he was both conscious of the custom, and made his will in reference to it—made his will with the intention that it was to be the same, whether the custom should be asserted against it or not; whereas, in this case, it appears that the testatrix, Mrs. Bostwick, was conscious of the existence of the claim of the Bostwicks, to an interest in the property she was bequeathing; and also conscious of the possible, if not probable, adverse result to her estate, of the assertion of that claim; and that thus conscious, she made her will in reference to the existing claim, and the possible, if not probable, result; and that so making the will, she made it with the intention that it was not to be varied at all, in respect to this spe-

cific legacy, by the existence of that claim, or the nature of that result.

Secondly. In that case, the *widow* never *consented* to the bequest—never consented to any thing which was equivalent to consenting to the bequest. On the contrary, she asserted her right to the very things which, by her husband, had been specifically bequeathed. Had the widow consented to the specific bequests, can there be a doubt that the decision would have been just the reverse of what it was? Would it have lain in the mouth of general legatees to say—Custom of London? In this case, the Bostwicks—the co-tenants of the testatrix, in the property bequeathed by her, consented to the bequest of it—consented to what was equivalent to consenting to that—consented to such a division of the whole common or joint property, as would leave in her severed share, the part she had specifically bequeathed. The cases, then, not being at all alike, *Webb vs. Webb* does not disturb the conclusion to which we had come.

[3.] This being a suit against an executor, legatees were not necessary parties to it. They were represented by him. This is the general rule. (*Calvert on Parties*, 20.) In this case there is nothing peculiar, to take the case out of the general rule.

[4.] Allen was not a proper party to the bill. There is not one allegation in it, that relates to him, unless an order to make him a party as trustee, amounts to an allegation that he is trustee. Therefore, it does not appear that he has any interest in the bill; and that one whose interest in a bill does not appear in the bill, is not a proper party to it, is too obviously true to need proof.

[5.] The plea was well over-ruled. This was shown, in showing the motion to have been well over-ruled.